NEW YORK CINDERS DELIVERY CO., Inc. v. BUSH TERMINAL CO.

The SCOW 14.

No. 110, Docket 21483.

United States Court of Appeals Second Circuit.

Argued Dec. 16, 1949.

Decided Jan. 3, 1950.

Platow & Lyon, New York City, proctors for appellant, Bush Terminal Company; Edward F. Platow, New York City, advocate.

Lawrence W. Silverman, New York City, proctor for appellee, New York Cinders Delivery Co., Inc., owner of Scow 14; George M. Golden, New York City, advocate.

Before AUGUSTUS N HAND, CHASE and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The libellant brought this suit in admiralty to recover damages for injury to its scow No. 14 through the alleged negligence of the respondent, Bush Terminal Company. The court below granted an interlocutory decree in favor of the libellant and referred the case to a Commissioner to report the amount of the damages. We think the evidence was insufficient to support the libellant's claim and that the decree must be reversed and the libel dismissed.

The trial judge found that libellant's scow No. 14 lay at the pier at the foot of 52nd Street, Brooklyn, on September 14, 1944, where she was tied fast; that later on during the same day the respondent

Bush Terminal Company moored its carfloat #566 to the same pier close to the prior mooring of the scow; that during a storm on the night of that day, and the early morning of September 15, the carfloat "was caused to collide with Scow #14"; that as a result of the collision, the scow was "caused to be stove in and sunk" and that the collision and the sinking of the scow "were solely due to the negligence of the respondent." On the morning of September 14th the libellant had warning of the approach of a hurricane. Between 4 and 6 P. M. the wind was between 23 and 25 miles per hour; between 6 and 7 P. M. the storm broke with high velocity. The wind reached 81 miles an hour at 7:27 P. M., and at 7:39 P. M. it reached 99 miles an hour. Still later it blew at very high velocity.

The carfloat was securely fastened by stout lines and as the storm increased another line was added. In spite of the hurricane the carfloat kept to its mooring, but the scow was stove in and sunk, and at least five of her six lines were broken. There was some testimony that one of her line still remained fastened, but that testimony was doubtful and was so unlikely as to be unbelievable. It seems impossible to suppose that a single five and one-half inch line would alone hold a heavy scow carrying a considerable load in an unprecedented hurricane which had been strong enough to part the other five lines. During the height of the storm the wind was blowing right up the slip and carrying the scow forward so that she was riding on the front of the float. This was the testimony of the respondent and it is supported by the strongest inherent probabilities.

The trial judge made no findings as to the proved fact that the bargee left his scow when there was a gale blowing and the weather reports showed a hurricane was soon to be encountered if it had not already set in. We have a case where the carfloat, by putting out an additional line, completely weathered the hurricane, whereas the bargee abandoned his scow under most dangerous weather conditions which resulted in the parting of five, if not all, of her six lines. It seems to us that the bargee neglected his duty and should have stayed at his post under such grave circumstances. Had he done so, and put out more lines, he might well have averted the disaster. The carfloat by an exercise of greater care rode out the storm safely.

It is argued that the float was moored too close to the scow. Its distance away was estimated by the witnesses for the parties from 58 feet to distances variously estimated at 20, 15 and 7 or 8 feet. But the distance of 7 feet was the estimate of the libellant's witness Putranich from the Luckenbach Line, who saw the scow at 7 P. M. with her lines still holding. Even if his disputed estimate was correct she might well have been much farther away at the time the carfloat was originally moored for a gale had been blowing from the end of the pier into the slip.

The question is whether the carfloat was moored too close to the scow. The absence of definite findings as to where she lay and of the testimony of any witnesses who actually saw the accident, the failure of the scow to put out lines that would hold her at a time when the carfloat was successfully secured, the neglect of the bargee to care for his scow in the face of an unusual hurricane of which he had ample notice, were acts of negligence. We think that they account for the accident much better than the supposition that the carfloat was moored too close to the scow.

The allegations of libellant's pleading seem to indicate that his claim is based on the contention that the carfloat rode back and collided with the scow. This, in view of the direction of the wind, would seem to have been wholly impossible. If he has any claim, it must be based on the theory that the carfloat was moored too close to the scow, and that the latter was blown into it by the force of the gale. We think such a theory, that does not seem to have been consciously adopted, must fail for the reasons we have given:

 It is obvious that the libellant had the burden of proving that the respondent was negligent in mooring its carfloat where it did. In our opinion it did not sustain that burden by proving that its scow was

injured without any definite showing as to how the injury was caused and by inferring that the staving in and sinking of the scow must have been due to the failure of respondent to moor his carfloat farther away.

For the foregoing reasons, the decree is reversed and the libel dismissed, with costs to the respondent.